## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FRANCES FORD, individually
and on behalf of other persons sim-
ilarly situated,

      Plaintiff,

    v.

MIDLAND FUNDING, LLC.;
MIDLAND CREDIT
MANAGEMENT, INC.; ENCORE
CAPITAL GROUP INC.; & LAW
OFFICE OF MICHAEL R.
STILLMAN, PC d/b/a/ THE
STILLMAN LAW OFFICE

      Defendants.

Case No. 16-12612
Hon. Terrence G. Berg

# ORDER DENYING WITHOUT PREJUDICE DEFENDANTS' MOTIONS TO COMPEL ARBITRATION, DKTS. 25, 26, AND SETTING SUMMARY TRIAL UNDER 9 U.S.C. § 4.

Plaintiff—an individual and a member of a putative class—brings a claim under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, against Defendants (debt collectors) and their law firm.[1] Plaintiff contends that Defendants sued her in state court to collect a credit card debt, but that their lawsuit

---

[1] Defendant Midland Credit Management is the servicer for Midland Funding, Dkt. 26, Ex. 1 at Pg ID 182. Midland Funding and Midland Credit Management are wholly owned subsidiaries of Defendant Encore Capital. Dkt. 29 at Pg ID 233. Defendant Stillman Law Office, on behalf of Midland funding, filed the state court action that is the basis for Plaintiff's lawsuit. Dkt. 35 at Pg ID 138-39.

was time-barred by the statute of limitations and thus illegal under the FDCPA. Defendants' motions ask this Court, over Plaintiff's objection, to dismiss this case and compel Plaintiff to arbitrate her claims on an individual, non-class basis.

For reasons explained in detail below, the question whether Defendants may compel arbitration is premature. Before deciding whether Defendants may compel arbitration, it is necessary to determine whether Plaintiff and Defendants actually entered into an arbitration agreement. The Federal Arbitration Act contains a summary trial procedure to make such a determination where the existence of a contract to arbitrate is in issue. The existence of such an agreement is at issue here, so the Court will deny Defendants' motions to compel arbitration without prejudice and set this case for summary trial.

## I. Background and Procedural History

The record in this case shows that Plaintiff's credit card account was owned by several entities before Midland allegedly purchased it. In 2003, Plaintiff opened a credit card with Fleet Bank ("Fleet"), which merged into Bank of America ("BOA") in 2005. Dkt. 30, Ex. A at Pg ID 392. In October 2006, BOA merged into FIA Card Services. ("FIACS"). *Id.* All FIACS credit card accounts are subject to a Credit Card Agreement. FIACS's 2006 agreement contained an arbitration clause and a "delegation provision,"

which reserved the threshold question of whether a dispute was arbitrable for an arbitrator instead of the court. That delegation provision provides in relevant part:

> "Any claim or dispute by either you or us against the other …shall, upon election by either you or us, be resolved by binding arbitration. The arbitrator shall resolve any Claims, including the applicability of this Arbitration and Litigation Section or the validity of the Entire Agreement…."

Dkt. 26, Ex. 1 at Pg ID 195, ¶ 48. According to Defendants, Plaintiff last used her card on December 8, 2006 and FIACS charged-off her account for non-payment later that month. Dkts. 26, Ex. 2 at Pg ID 191; 30, Ex. 2 at Pg ID 393.

Then, in September 2008, Midland allegedly purchased Plaintiff's charged-off account from FIACS. Dkt. 26, Ex. 1 at Pg ID 183. On December 26, 2015—more than seven years after purchasing Plaintiff's debt—Midland filed a collection lawsuit against Plaintiff in Michigan state court by and through Defendant Stillman Law Office. Plaintiff asserted that the statute of limitations had run on her debt as an affirmative defense. Dkt. 35, Ex. 7 at Pg ID 4. In April, 2016, at Stillman's request, the court entered a stipulated dismissal of Midland's case with prejudice. *Id.* at Pg ID 8.[2]

---

[2] At the oral argument on April 3, 2017 counsel for Midland stated that it was his "understanding" that Midland's state court case against Plaintiff was dismissed "without prejudice." Dkt. 35, Ex. 9 at Pd ID 783. This statement was incorrect, as the case was dismissed with prejudice.

The record is unclear whether Midland's case was dismissed with prejudice *because* Plaintiff's debt was in fact time-barred. However, Michigan's statute of limitations for debt collection is six years, M.C.L. § 600.5807(8), and Midland sued Plaintiff on December 15, 2015, Dkt. 35, Ex. 6 at Pg ID 749, more than nine years after Plaintiff's last account activity on December 8, 2006.

The record before the Court also shows that on September 3, 2015—approximately four months before Midland brought suit against Plaintiff in Michigan state court over a nine-year-old debt—Midland entered into a consent order with the United States Consumer Financial Protection Bureau (CFPB) that enjoined the company from among other things: (1) attempting to collect time-barred debt; (2) procuring and submitting misleading affidavits in debt collection litigation; and (3) attempting to collect debt based on potentially inaccurate data. Dkt. 36, Ex. C at Pg ID 358-64; 2015-CFPB-0022. In addition, as Plaintiff points out and Defendants do not contest, in August 2016, the American Arbitration Association (AAA)—a leading national provider of alternative dispute resolution services—indicated that it would no longer administer claims involving Midland because the company failed to comply with numerous AAA policies. Dkt. 29, Ex. D.

Plaintiff alleges, individually and on behalf of a putative class, that Defendants attempted to collect time-barred debt in violation

of: (1) the FDCPA, 15 U.S.C. §§ 1692(f)-(e); (2) the 2015 CFPB consent order; and (3) the Michigan Regulation of Collection Practices Act. M.C.L. § 445.252.

Defendants contend that the arbitration clause and delegation provision in the FIACS 2006 credit card agreement govern Plaintiff's account and therefore, because Defendants so elect, this Court must compel Plaintiff to arbitrate (1) her claims (on an individual, non-class basis) and (2) all threshold questions of arbitrability, including the question of whether an arbitration agreement exists between the parties. Plaintiff contends that there are issues of fact regarding whether Midland owns her account and, if it does, whether FIACS ever sent her the 2006 agreement. Thus, Plaintiff argues, notwithstanding the 2006 agreement's delegation provision, this case must proceed summarily to trial on the issue of whether the 2006 agreement is contractually binding on the parties. *See* 9 U.S.C. § 4.[3]

## II.  Standard of Review

The Federal Arbitration Act (FAA) "embodies the national policy favoring arbitration and places arbitration agreements on equal

---

[3] Section 4 of the Federal Arbitration Act provides: "If the making of the arbitration agreement or the failure, neglect of refusal to perform the same be in issue, the court shall proceed summarily to trial thereof. If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue."

footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardena*, 546 U.S. 440, 443 (2006) (citing 9 U.S.C. § 2). Despite this liberal federal policy favoring arbitration agreements, arbitration is a "matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.* v. *Commc'ns Workers of Am.*, 475 U.S. 643 (1986).

In most cases, before compelling an unwilling party to arbitrate, "the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir 2016) (quoting *Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 624 (6th Cir. 2003)). And, "because arbitration agreements are fundamentally contracts," courts apply the "applicable state law of contract formation" in performing this limited review. *Tillman v. Macy's, Inc.,* 735 F.3d 453, 456 (6th Cir. 2013) (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.,* 507 F.3d 967, 972 (6th Cir 2007)).

Sometimes, however, an arbitration clause contains a delegation provision that allows parties to "arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Before a court can enforce a delegation provision, however, it must find that the parties "clearly and unmistakably" manifested their intent to delegate threshold questions of arbitrability to an arbitrator. *Id.* at n. 1.

Where a party admits it assented to a contract containing an arbitration clause and delegation provision, gateway questions concerning the arbitration clause's enforceability (for example, whether the contract it is within is unconscionable), validity, or scope, are for an arbitrator to decide. *See, e.g., Danley v. Encore Capital Group, Inc.*, 680 F. App'x. 394 (6th Cir. 2017) (where Plaintiff signed a contract with an arbitration clause and delegation provision, question of arbitration clause's validity under the Uniform Commercial Code (UCC) was for the arbitrator). But what if—as here—a party resisting arbitration contends that she never assented to a contract containing an arbitration clause and delegation provision? Is the gateway question of *whether an arbitration agreement between the parties exists*—as opposed to questions about its validity, enforceability, or scope—also for the arbitrator to decide? Neither the Sixth Circuit nor the Supreme Court have explicitly answered this question, though close reading of each court's precedent suggests that, in most cases, their answer would be no.

In *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287 (2010), the majority stated in dictum that before a court can determine that parties agreed to arbitrate a dispute, it must find that their agreement "was validly formed and (absent a provision clearly and validly committing such issues to the arbitrator [that is, a delegation provision]) is legally enforceable and best construed to encompass the dispute." *Id.* at 303. As Professor Karen Halverson points out, in that sentence the "placement of the parenthetical" suggests that the opinion "draws a distinction between the issue of contract formation and issues of contract enforceability and interpretation" and implies "that only the latter two issues can be delegated to [an] arbitrator." Karen Halverson Cross, *Letting the Arbitrator Decide Unconscionability Challenges*, 26 Ohio St. J. on Disp. Resol. 1, 59-60 (2011).

The Sixth Circuit, and at least one other Circuit, seem to agree with Professor Cross's interpretation of *Granite Rock*. In *Danley*, for example, the circuit court noted that it was typically "within the district court's province" to decide the threshold question of contract formation. 680 F. App'x. at 397-98 (quoting *Granite Rock*, 561 U.S. at 296); *see also Kubala v. Supreme Prod. Servs.*, Inc., 830 F.3d 199, 202 (5th Cir. 2016) (noting that even where a party seeking arbitration "points to a purported delegation clause," the court always performs a contract formation analysis).

Another court has pointed out in a well-reasoned opinion treating this issue that under the Supreme Court's decision in *Rent-A-Center*, a court must find "clear and unmistakable evidence" that the parties intended to arbitrate the question of arbitrability before enforcing a delegation provision. Further, the text of a delegation provision itself is "only a valid indicator of the parties' intent if they agreed to be bound by its terms." *Allstate Ins. Co. v. Roll Bros., Inc.,* 171 F. Supp. 3d 417, 424 (E.D. Pa. 2016). This reasoning makes sense because a delegation provision is only vested with legal force if the parties agreed to it. Therefore, a court must first conclude that an agreement exists before considering whether to enforce a delegation provision and compel the parties to arbitrate questions of an arbitration clause's validity, enforceability, or scope.

If it is clear that a contract containing an arbitration clause and delegation provision exists, a court must then decide whether to grant or reject a motion to compel arbitration as a matter of law. However, the Federal Arbitration Act provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. Neither the Supreme Court nor the Sixth Circuit has announced a standard for determining when a motion to compel arbitration should proceed to trial under 9 U.S.C. § 4. Several other circuits, howev-

er, liken the standard to one for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016); *accord Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 984 (10th Cir. 2014); *Neb. Mach. Co. v. Cargotec Solutions, LLC.*, 762 F.3d 737, 743 (8th Cir. 2014); *SBRMCOA LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 271 (3d Cir. 2013).

The Court will therefore apply this summary-judgment-like standard and "conclude as a matter of law that the parties did or did not enter into a contract containing an arbitration clause and delegation provision only if 'there is no genuine dispute as to any material fact' concerning the agreement's formation." *Bazemore*, 827 F.3d at 1333 (quoting Fed. R. Civ. P. 56(a)); *accord Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) ("[A] dispute of material fact is genuine so long as the evidence is such that a reasonable jury could return a verdict for the non-moving party") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.  Analysis

Defendants contend that the arbitration clause and delegation provision in the 2006 FIACS card member agreement governs this

dispute.[4] Defendants further argue that because they have elected to arbitrate this dispute the court must now compel Plaintiff to arbitrate all her claims *as well as* the issue of whether she formed a contract to arbitrate in the first place.

Plaintiff responds that issues of fact remain about whether Midland purchased Plaintiff's account from FIACS and, even if it did, whether FIACS ever sent her the 2006 agreement. Therefore, Plaintiff argues, this case must proceed summarily to trial on the question of contract formation.

In support of their argument that the parties intended to arbitrate even the question of contract formation, Defendants point only to the text of a delegation provision that Plaintiff claims she never assented to. Accordingly, the Court rejects Defendant's argument and will consider the question of whether the parties agreed to the 2006 agreement, and how that question should be resolved.

*1. Applicable Law*

The Court applies Michigan law to decide contract disputes such as whether an arbitration agreement between the parties ex-

---

[4] To reiterate, the arbitration clause and delegation provision provides: "Any claim or dispute by either you or us against the other …shall, upon election by either you or us, be resolved by binding arbitration. The arbitrator shall resolve any Claims, including the applicability of this Arbitration and Litigation Section or the validity of the Entire Agreement…." Dkt. 26, Ex. 1 at Pg ID 195, ¶ 48.

ists. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 91-92 (1938). In Michigan, the proponent of a contract must prove its existence by a preponderance of the evidence. *Bank of America, N.A. v. First American Title Ins. Co.*, 499 Mich. 74, 100 (Mich. 2016). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Id.* at 101. The general rule is that a contract, including an arbitration agreement, is freely assignable. *Detroit, T & I.R. Co. v. W.U. Tel. Co*, 200 Mich. 2, 5-6 (1918). But to enforce an assigned agreement, an assignee must first establish that the agreement was in fact assigned to it. *Weston v. Dowty*, 163 Mich. App. 238, 242-43 (1987).

Mutuality of agreement requires a "meeting of the minds," which is "a figure of speech for mutual assent." *Hall v. Small*, 267 Mich. App. 330, 333 (2005) (quoting *Kamalnath v. Mercy Mem. Hosp. Corp.,* 194 Mich. App. 543, 548 (1992)). A party may assent to any contract, including a card member agreement, through conduct (for example, by using a credit card). *See, e.g., Unifund CCR Partners v. Riley,* 2010 WL 571829, at \*2-3 (Mich. Ct. App. Feb. 18, 2010). It is axiomatic, however, that a party cannot assent to an agreement—even through conduct—if the agreement was never sent or otherwise communicated to her. *See* M.C.L. § 445.862 ("A retail charge agreement shall be considered signed

and accepted by the buyer if after a request for a retail charge account… the [account] is used by the buyer […] A copy of the agreement shall be delivered or mailed to the buyer before the date the first payment is due under the agreement").

Finally, Rule 803(6) of the Federal Rules of Evidence "permits records of regularly conducted business activity into evidence…." *United States v. Collins*, 799 F.3d 554, 582 (6th Cir. 2015). This exception to the rule against hearsay is "based on the indicia of reliability that attach to a record created…by an employer in the ordinary …course of their business." *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). Business records may be admitted if a custodian or other qualified witness (who is familiar with the record keeping system) testifies or certifies that the records were: "(1) 'created in the course of a regularly conducted business activity', (2) 'kept in the regular course of that business', (3) 'resulted from a regular practice of that business,' and (4) 'were created by a person with knowledge of the transaction or from information transmitted by a person with knowledge.'" *Collins*, 799 F.3d at 582-83 (quoting *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC,* 774 F.3d 1065, 1071-72 (6th Cir. 2014); *see also* Fed. R. Evid. 803(6)).

If a custodian or other qualified witness lays a sufficient foundation, "the proper approach is to admit the evidence and permit

the jury to determine the weight to be given to the records." *United States v. Hathaway*, 798 F.2d 902, 908 (6th Cir. 1986). Unless, that is, there exists "specific and credible evidence of untrustworthiness." *Id.; see also* Fed. R. Evid. 803(6)(E) (business records excludable if "the source of information or circumstances of preparation indicate a lack of trustworthiness"). Under Rule 406, "evidence of…an organization's routine practice may be admitted to prove that on a particular occasion the…organization acted in accordance with the…routine practice." Fed. R. Evid. 406. And, under Rule 803(8), a record of a public office that sets out factual findings from a legally authorized investigation are excepted from the rule against hearsay. Fed. R. Evid. 803(8)(a)(iii).

*2. Discussion*

Defendants maintain that the FIACS 2006 card member agreement is contractually binding on Midland and Plaintiff. Defendants must therefore prove by a preponderance of the evidence that the contract exists. Plaintiff argues that Defendants have not met this burden, as there are issues of fact regarding whether Midland purchased Plaintiff's account from FIACS and, even if it did, whether FIACS ever sent her the 2006 agreement. As proof of these two events, Defendants submit various business records and corresponding affidavits from Michael Burger, Director of Operations for Midland Credit Management ("MCM"), Dkt. 26, Ex.1, and

Nichole Piper, Senior Vice President of Bank of America. Dkt. 30, Ex. A.

In their declarations, Mr. Burger and Ms. Piper recite Rule 803(6)'s requirements for authenticating business records—they attest that they are familiar with Midland's and FIACS's record keeping practices respectively and that their declarations are made either from personal knowledge of the matters set forth therein, or on information and belief. Dkt 26, Ex. 1. at 182-83; Dkt. 30, Ex. A at Pg ID 392. They also both declare that the following are true and correct business records maintained by MCM, or its predecessors or assigns, in the course of regularly conducted business activity: (1) the Bill of Sale between Midland and FIACS, Dkt. 26, Ex. 1 at Pg ID 187, (2) MCM's excel file linking Plaintiff's account to the Bill of Sale, *Id.* at 189, (3) the 2006 FIACS card member agreement, *Id.* at 193-96, and (4) Plaintiff's account statement indicating that her BOA account was active as of December 2006. *Id.* at 191.

Additionally, Mr. Burger declares that 2006 agreement "governed to [Plaintiff's FIACS account] [sic] at the time [it] was sold to Midland funding." Dkt. 26, Ex. 1 at Pg ID 184. And, Ms. Piper declares that Plaintiff's "account file notes indicate that the 2006 Credit Card Agreement was sent to [Plaintiff] in connection with [BOA's] merger with FIACS," and that there "is no evidence in the

notes for [Plaintiff's] account that the [agreement] was returned as undeliverable." Dkt. 30, Ex. A at Pg ID 393.

Declarations like Mr. Burger's and Ms. Piper's are often accepted as sufficient to lay a foundation for a Court to admit the corresponding business records under Rule 803(6). Moreover—absent evidence to the contrary—a reasonable jury would probably conclude that it is more likely than not that Midland owned Plaintiff's account and, based on Ms. Piper's declaration, that FIACS sent Plaintiff the 2006 agreement.

But there is some evidence before the court casting doubt on Midland's credibility concerning its debt collection litigation practices. Some of those practices have included procuring and submitting misleading or false business records. As discussed, the American Arbitration Association (AAA) will no longer administer claims involving Midland. Much more significantly, the 2015 CFPB Consent Order that Midland stipulated to found that that the company, among other things:

> (1) "Routinely requested and used affidavits from sellers that contain false or misleading statements regarding the seller's review of unattached records…According to an Encore Senior manager responsible for negotiating debt purchase agreements, the ability to request affidavits from sellers that purport to be based on a review of documentation is negotiated by Encore "as a safeguard, should documentation not exist, so we have some form of evidence from the seller;"

(2) "Routinely submitted business records affidavits in which affiants swear that attached documentation relates to individual Consumer's accounts. However, in many instances, the attached documentation, which sometimes include[s] generic credit card agreements created years after the Consumer purportedly defaulted on the agreement, does not in fact relate to the account;" and

(3) "In numerous instances, from at least 2009 to 2011… submitted affidavits in which affiants misrepresented that they had personal knowledge of facts contained in affidavits.

Dkt. 36, Ex. C at Pg ID 860-63.

And, for its part, Bank of America stipulated to a consent order with the Office of the Comptroller of the Currency (OCC), in which the OCC found, among other things, that in connection with its sworn document and collections litigation processes, the bank "filed or caused to be filed in courts affidavits executed by its employees …making assertions in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records." 2015-OCC-046 at 4, https://www.occ.gov/static/enforcement-actions/ea2015-046.pdf.

In addition to the doubts raised by the AAA letters and CFPB and OCC consent orders, careful examination of the business rec-

ords and affidavits that Defendants have submitted *in this case* raise a number of similar red flags. First, Ms. Piper declares that Plaintiff's "account notes indicate" that the FIACS 2006 agreement was sent to Plaintiff. Ms. Piper does not state that the 2006 agreement *was* sent to Plaintiff. *See Bazemore* 827 F.3d at 1331 (declarant's statement that card member agreement "would have been sent" not competent evidence to prove that it was sent). Moreover, Defendants do not provide the "account notes" showing the sending of the agreement that Ms. Piper alleges she reviewed. Nor does Ms. Piper provide an address to which FIACS supposedly sent the 2006 agreement.

Second, in Defendants' state court case against Plaintiff, they submitted a generic 1999 Bank of America card member agreement as the contract governing Plaintiff's account. Dkt. 35, Ex. 6 at Pg ID 758-66. That 1999 card member agreement was an entirely different agreement from the generic 2006 agreement that Defendants now claim controls.

Third, as the Court noted at oral argument, the exemplar 2006 agreement that Defendants provided is not very legible. Dkt. 34 at Pg ID 525. The Court requested that Defendants submit a more readable version, but they did not produce a different copy. Rather, in their supplemental briefing, Defendants appear to have submitted a digitally enlarged, but still difficult to read, version of

the delegation provision from the 2006 agreement. Dkt. 37 at Pg ID 796.

Fourth, in Mr. Burger's declaration, he refers to Plaintiff's account as "opened on May 16, 2003" and "ending in 0828." Dkt. 26, Ex. 1 at Pg ID 183. Whereas Ms. Piper refers to the account Plaintiff opened on May 16, 2003 as ending in "4764." Dkt. 30, Ex. A at 392.

Fifth, in their motion to compel arbitration, Defendant Stillman Law Office attached a Bill of Sale, that they claimed applied to Plaintiff's account, between Bank of America and Cavalry SPV I, LLC—that is, a company other than Midland. In their reply brief, Defendant Stillman Law Office stated that including this document was "purely erroneous." Dkt. 31 at Pg ID 500.

Thus, before the Court are: (1) records from two federal agencies that, pursuant to legally authorized investigations, set out findings that Midland and Bank of America have routinely submitted misleading or false documents and affidavits in debt collection litigation, and (2) indicia of untrustworthiness in the documents and affidavits that Midland and Bank of America have submitted in this case. The Court cannot be certain at this point whether, in light of these issues, there would be a sufficient foundation to permit the admission of the business records Defendants seek to rely upon. If such records were excluded, a reasonable ju-

ry could certainly conclude that the evidence did not establish that Midland owned Plaintiff's account or that FIACS ever sent her the 2006 agreement.

For now, however, the Court has made no determination concerning the admissibility of the business records Defendants have submitted. Indeed for the purposes of this Order the Court will assume that these records will be admitted under Rule 803(6), together with the CFPB and OCC consent orders under Rules 406 and 803(8)(a)(iii). Fed. R. Evid. 803(6), (8); 406. To resolve this motion, the question is whether there is a genuine issue of material fact regarding Midland's ownership of Plaintiff's account and whether FIACS sent Plaintiff the 2006 agreement. The answer to both of these questions is yes.

On the record before the Court, a reasonable jury could determine that Defendants' business records, declarations, or witness testimony, are entitled to little or no weight. Based on that determination a reasonable jury could then conclude there is no evidentiary basis for finding that Midland owns Plaintiff's account. Moreover, even if a jury concluded that Midland does own Plaintiff's account, they could still find that Midland had not proven by a preponderance of the evidence that it sent Plaintiff the 2006 agreement. The jury might give more weight to the CFPB consent order indicating that Midland has supplied affidavits from debt

sellers (like Bank of America) in lieu of documentary evidence; or to the OCC consent order indicating that Bank of America affiants have asserted they have reviewed records that they have not; particularly when the only evidence that FIACS sent Plaintiff the 2006 agreement is Ms. Piper's uncorroborated and somewhat equivocal statement that Plaintiff's "account notes"—which Defendants have not provided—indicate that FIACS sent that agreement.

For these reasons, the Court finds that there are genuine issues of material fact as to: (1) whether Midland purchased Plaintiff's account from FIACS, and (2) whether FIACS ever sent Plaintiff the 2006 agreement. There is consequently a genuine issue of material fact as to whether an arbitration agreement exists.

## IV.   Conclusion

Because the Federal Arbitration Act provides for a summary trial procedure in cases where there is a genuine issue of a material fact as to whether an arbitration agreement exists, this case must proceed summarily to trial on the issue of contract formation. *See* 9 U.S.C. § 4. The Court will therefore **DENY WITHOUT PREJUDICE** Defendants' motions to compel arbitration (Dkts. 25 and 26) until the summary proceeding has determined whether or not an arbitration agreement existed. Defend-

ants may renew their motions if the summary trial results in a finding that an arbitration agreement existed.

**SO ORDERED.**

Dated: September 8, 2017

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on September 8, 2017.

s/A. Chubb
Case Manager